# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ROSANNA M. HAMBLIN,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, *in her capacity as Acting Commissioner of the Social Security Administration*,<br><br>Defendant. | **REPORT AND RECOMMENDATION**<br><br>Case No.  2:13-cv-00887-TS-EJF<br><br>District Judge Ted Stewart<br><br>Magistrate Judge Evelyn J. Furse |

Plaintiff Rosanna M. Hamblin filed this action asking the Court to remand the final agency decision denying her Disability Insurance Benefits ("DIB") under Title II of the Social Security Act,[1] *see* 42 U.S.C. §§ 401–434.  The Administrative Law Judge ("ALJ") determined that Ms. Hamblin did not qualify as disabled within the meaning of the Social Security Act. (Admin. R. Doc. 15, certified copy tr. of R. of admin. proceedings: Rosanna M. Hamblin [hereinafter Tr. __].)  Having carefully considered the parties' memoranda, the record, and the relevant legal authorities, the undersigned RECOMMENDS the District Court remand the

---

[1] On October 9, 2013, Judge Ted Stewart referred this case to the undersigned Magistrate Judge under 28 U.S.C. § 636(b)(1)(B).  (ECF No. 4.)

Commissioner's decision because the ALJ improperly evaluated Dr. Salter's opinion, Ms.

Hamblin's credibility, and thus Ms. Hamblin's residual functional capacity ("RFC").[2]

# I.  PROCEDURAL HISTORY

On July 8, 2009, Ms. Hamblin filed for DIB alleging April 16, 2005 as the onset date of

her disability.  (Tr. 15.)  Ms. Hamblin later amended her alleged onset date to June 4, 2009.  (Tr.

15, 76, 78.)  The Regional Commissioner denied Ms. Hamblin's claims on November 5, 2009,

(tr. 81–84), and again upon reconsideration on March 11, 2010, (tr. 86–88).  At Ms. Hamblin's

request, a hearing before an ALJ took place on January 12, 2012 (the "Hearing").  (Tr. 15, 33–

75.)  On February 2, 2012, the ALJ issued a decision (the "Decision") denying Ms. Hamblin's

claims.  (Tr. 15–26.)  On February 15, 2012, Ms. Hamblin requested the Appeals Council review

the ALJ's Decision.  (Tr. 11.)  The Appeals Council denied Ms. Hamblin's request on July 12,

2013, (tr. 3–7), making the ALJ's Decision the Commissioner's final decision for purposes of

judicial review under 42 U.S.C. § 405(g).  *See* 20 C.F.R. § 404.981 ("The Appeals Council's

decision, or the decision of the administrative law judge if the request for review is denied, is

binding unless you or another party file an action in Federal district court . . . .").

# II.  FACTUAL BACKGROUND

## A.  *Medical Records*

The undersigned summarizes the significant medical records as follows.

In March 2005, Ms. Hamblin's internist referred her to a specialist because of her

increasing complaints of lower back pain.  (Tr. 632–40.)  On April 19, 2005, with the assistance

of an MRI, Melanie B. Kinchen, M.D., diagnosed Ms. Hamblin with "a right paracentral disk

---

[2] Pursuant to Civil Rule 7-1(f) of the Rules of Practice for the United States District Court for the District of Utah, the undersigned finds oral argument unnecessary and will determine the appeal on the basis of the written memoranda.

herniation at L5-S1 with some impingement on the right S1 nerve root[,] . . . neural foraminal stenosis," and "severe degenerative disk disease at L5-S1" and indicated Ms. Hamblin did not qualify for spinal fusion surgery due to her weight.  (Tr. 625–26.)  Around that time, Ms. Hamblin stood five foot two inches tall and weighed 234 pounds.  (Tr. 625.)  On July 14, 2006, a surgeon in California performed gastric bypass surgery on Ms. Hamblin to assist her in losing weight so that she could qualify for back surgery.  (Tr. 177.)  Following the gastric bypass surgery, Ms. Hamblin lost around eighty pounds.  (Tr. 509.)  At the Hearing, Ms. Hamblin testified she was five foot two and three-quarter inches and 180 pounds.  (Tr. 39.)

On June 11, 2007, Ms. Hamblin underwent spinal fusion surgery.  (Tr. 648.)  She recovered well, (tr. 394, 395, 398), but her pain relief only lasted a year, (tr. 279).  The record also reflects Ms. Hamblin has taken Buspirone and Cymbalta for anxiety since at least April 2008.  (Tr. 382.)

Ms. Hamblin started seeing David Salter, M.D., her regular family physician, (tr. 179), in July 2008, shortly after moving to Utah.  (Tr. 354.)  At that time, she reported suffering from chronic lower back pain and fibromyalgia.  (*Id.*)

In early 2009, Dr. Salter ordered an MRI of Ms. Hamblin's C-spine because she presented to him with neck pain that radiated into her nuchal area, shoulders, and arms.  (Tr. 340–41.)  The MRI showed mild degenerative disc disease and minor disc bulge at C5-C6, (tr. 284), which Dr. Salter noted when Ms. Hamblin came back with complaints of increasing amounts of pain, (tr. 338–39).

On June 1, 2009, Ms. Hamblin presented to Dr. Salter with pain in her right shoulder.  (Tr. 314.)  Dr. Salter observed her shoulder had limited range of motion and injected it with

Lidocaine and Celestone.  (Tr. 314-15.)  After Ms. Hamblin told Dr. Salter she considered

applying for social security disability, Dr. Salter told Ms. Hamblin how to apply.  (Tr. 314.)

Shortly after her amended alleged onset date, on June 8, 2009, Ms. Hamblin presented to

Dr. Salter with increased generalized pain, especially in her right buttock with right L5 sciatic

distribution, and cold intolerance.  (Tr. 310.)  Dr. Salter reminded Ms. Hamblin she had a chronic

condition with relapses, subjecting her to flare-ups.  (*Id.*)  Ms. Hamblin did report her right

shoulder felt "substantially better" after Dr. Salter injected it a few days prior.  (*Id.*)  Dr. Salter

advised Ms. Hamblin to keep her medication levels consistent as Dr. Salter had Ms. Hamblin "on

essentially maximal medical therapy for fibromyalgia."  (*Id.*)  Finally, Dr. Salter noted Ms.

Hamblin mentioned pursuing social security disability again.  (*Id.*)

The next day Ms. Hamblin presented to the Kane County Hospital Clinic with a migraine.

(Tr. 309.)  The physician's assistant found Ms. Hamblin had no neck or C-spine pain, gave her

injections of Imitrex and Hydroxyzine, and monitored her for fifteen minutes before she stated

she felt much better.  (*Id.*)  The physician's assistant also noted that Ms. Hamblin's Cymbalta

reacted poorly with Imitrex in the past.  (*Id.*)  The physician's assistant sent Ms. Hamblin home

with the suggestion she follow up with Dr. Salter soon.  (*Id.*)

Later, in June 2009, Dr. Salter refused to refill Ms. Hamblin's Oxycodone early or give

her other pain medication until her next scheduled refill.  (Tr. 307.)  Ms. Hamblin asked Dr.

Salter, alternatively, for a stronger dose so she could stop taking extra doses, but he also refused

that request because he had already prescribed the highest dosage permitted.  (*Id.*)

Ms. Hamblin then asked Zion Pain Management Center ("Zion"), her pain management

specialists, for extra pain medication, but the doctors there refused to write her a prescription as

well.  (Tr. 272–73, 275.)  During her visit at Zion, Ms. Hamblin had an antalgic gait and

tenderness to palpation at her right and left buttocks, sacroiliac joints, and right and left hips, but a normal spinal curvature and a negative bilateral straight leg raise.  (Tr. 272.)  Diagnosed with failed back surgery syndrome, bilateral lumbar radiculopathy, cervical radiculopathy, cervical degenerative disc disease, fibromyalgia, and hip bursitis, (tr. 273), Ms. Hamblin got injections of Bupivacaine and Depomedrol for the pain, (tr. 270, 274).

On June 26, 2009, a CT of Ms. Hamblin's lumbar spine showed a stable appearing fusion at L4 to S1, severe degenerative disc disease at L5/S1, and well-maintained vertebral height. (Tr. 372.)  Dr. Salter did not find the CT "particularly revealing."  (Tr. 302.)

On August 18, 2009, Ms. Hamblin presented to Zion for pain all over her body, especially in her low back and lower extremities.  (Tr. 289.)  Ms. Hamblin admitted to overusing her medication and running out of Oxycodone a week early because her current medication regime did not control her pain well.  (*Id.*)  Instead, Ms. Hamblin wanted another caudal epidural steroid injection, recommendations for medication management, and a trial spinal cord stimulator implant.  (*Id.*)  She got Neurontin, one of her medications, increased, (tr. 290), and an injection of Kenalog and Bupivacaine, (tr. 268).

On August 21, 2009, Dr. Salter observed Ms. Hamblin had leg pain, mostly on the anterolateral thigh, but was "doing fairly well" with her "migraine stress and anxiety."  (Tr. 302.) Dr. Salter also noted Ms. Hamblin's long history of petit mal seizures, relying on an older EEG that showed "some wave-form abnormalities," and agreed to let her slowly change medications for the condition.  (*Id.*)

On September 1, 2009, Ms. Hamblin received a trial spinal cord stimulator.  (Tr. 265–66.)  During the next few days, Ms. Hamblin stated that the stimulator "work[ed] well," (tr. 262), and that it improved her low back pain and radiculopathy by over fifty percent, (tr. 263).

In October 2009, Dr. Salter mentioned Ms. Hamblin took "several antidepressants at maximal doses" and advised her to lose more weight given her forty-pound weight gain in the prior year. (Tr. 847.) He also refilled her pain medications. (*Id.*)

An X-ray on November 2, 2009 showed degenerative changes throughout Ms. Hamblin's thoracic and lumbar spine. (Tr. 936.) An MRI on the same day showed "[m]ultilevel mild degenerative disc disease involving the mid and lower thoracic spine without significant central canal stenosis or neural foraminal narrowing." (Tr. 836.)

On November 5, 2009, Ms. Hamblin received the permanent spinal cord stimulator. (Tr. 946–47.) Dr. Salter consented to Ms. Hamblin taking more Oxycodone as she recovered from the surgery. (Tr. 847.) On November 11, 2009, Ms. Hamblin experienced pain with back flexion and extension during a follow-up visit at her surgeon's office. (Tr. 1004–05.) The next day, Ms. Hamblin reported that the stimulator "actually seems to be working fairly well." (Tr. 845.)

During a December 16, 2009 visit, Dr. Salter refilled Ms. Hamblin's Oxycodone but dated the prescription for two days later when the previous prescription should have expired. (Tr. 843.) On December 21, 2009, Ms. Hamblin presented to Dr. Salter with a stiff and painful right shoulder that Dr. Salter confirmed by finding tenderness in the upper trapezius, posterior shoulder, teres major area, and subacromial area. (Tr. 840.) Dr. Salter injected her shoulder with Lidocaine, Marcaine, and Kenalog. (*Id.*)

On January 29, 2010, Ms. Hamblin asked for her prescriptions in advance because she needed to go to California to care for her mother. (Tr. 1028.)

On April 15, 2010, Ms. Hamblin presented to Dr. Salter with generally increasing symptoms after returning from her trip to California and a migraine that morning. (Tr. 1023.)

Ms. Hamblin reported she found the trip stressful.  (*Id.*)  Dr. Salter found Ms. Hamblin had a focal trigger point in her right upper back next to her scapula, radiating pain in her shoulder and arm, increased low back pain, and general fibromyalgia muscular pain.  (*Id.*)  Ms. Hamblin also reported increasing pain in both her ankles and feet over the last few months.  (*Id.*)  Dr. Salter injected the trigger point with Lidocaine and applied local heat to it.  (*Id.*)  Dr. Salter also reviewed Ms. Hamblin's medications and noted she took "fairly large doses" of Oxycodone. (*Id.*)  A week later, Ms. Hamblin called Dr. Salter stating she could no longer afford Provigil, one of her medications, and inquired whether an alternative existed.  (*Id.*)

On May 5, 2010, Ms. Hamblin found herself distraught due to caring for her mother and traveling.  (Tr. 1021.)  In addition to her usual difficulties, Ms. Hamblin reported foot pain that suggested plantar fasciitis.  (*Id.*)  Ms. Hamblin had run out of her medications about ten days early and wanted Dr. Salter to refill them, causing a "long and even somewhat contentious discussion."  (*Id.*)  Dr. Salter initially refused but relented due to the amount of stress Ms. Hamblin reported.  (*Id.*)  Dr. Salter warned Ms. Hamblin that the early refill had to last until her next scheduled refill in mid-June.  (*Id.*)  Dr. Salter also changed one of Ms. Hamblin's medications and prescribed a new one.  (*Id.*)

In June 2010, Dr. Salter noted Ms. Hamblin had rescheduled nerve conduction studies of her upper extremities that she wanted done because she had numb, tingly hands and thought she had nerve damage.  (Tr. 1069.)

On October 11, 2010, Ms. Hamblin described her chronic pain issues and life situation as "fairly stable."  (Tr. 1068.)  Dr. Salter explained that her fibromyalgia probably aggravated her pain, noting the June 2010 neuro conduction studies, consistent with Ms. Hamblin's earlier 2009 MRI, showed only "fairly moderate disease."  (*Id.*)  Dr. Salter refilled some of Ms. Hamblin's

medications in the usual amounts, but Ms. Hamblin could no longer afford Cymbalta.  (*Id.*)  A week later, Ms. Hamblin returned reporting extremely cold and numb hands and feet but a sweaty neck and upper torso.  (Tr. 1065.)  Dr. Salter opined that Ms. Hamblin could have been experiencing withdrawal as her insurance did not approve some of her usual medications.  (*Id.*)  He diagnosed her with "[a]utonomic dysautonomia secondary to numerous factors of chronic pain, fibromyalgia, and . . . acute stress."  (*Id.*)

On December 8, 2010, Ms. Hamblin presented to Dr. Salter with right shoulder pain; Ms. Hamblin's shoulder had full range of motion but a very tight and tender myofascial band in the mid-trapezius.  (Tr. 1064.)  Dr. Salter injected the trigger point in her shoulder with Lidocaine.  (*Id.*)

On December 16, 2010, Ms. Hamblin again presented to Dr. Salter with several issues, including numbness in her hands and feet, myofascial pain in the upper trapezius, periodic fairly severe sciatic pain, and constant pain in her right buttock.  (Tr. 1062.)  Dr. Salter noted that Ms. Hamblin's low back pain appeared "fairly stable at this point," and Ms. Hamblin reported her stress and anxiety as stable.  (*Id.*)  Finally, Dr. Salter referred Ms. Hamblin to a doctor she had previously seen for her plantar fasciitis to re-discuss orthotics--a therapy she initially rejected.  (*Id.*)

On April 7, 2011, Dr. Salter opined that Ms. Hamblin's "weight and large chest size" caused some of her problems.  (Tr. 1051.)  On June 9, 2011, Ms. Hamblin continued to complain about her chronic pain and numbness to Dr. Salter.  (Tr. 1046.)  He refilled her Oxycodone early because they just "re-established her pain contract" but emphasized the need for her to maintain her dosage and have consistent pain medication.  (*Id.*)  Dr. Salter also advised Ms. Hamblin to lose weight.  (*Id.*)

On August 31, 2011, Ms. Hamblin returned with persistent pain and tenderness at the plantar attachment in both feet, which she wished to address prior to taking a trip. (Tr. 1042.) Dr. Salter observed focal tenderness at the plantar attachment and pain with stretching and dorsiflexion of her feet and toes. (*Id.*) He diagnosed her with plantar fasciitis and did bilateral injections of Lidocaine and Celestone. (*Id.*)

On October 6, 2011, Ms. Hamblin presented to Dr. Salter with pain on the bottoms of her feet. (Tr. 1041.) After Dr. Salter observed moderate tenderness at the attachment of the plantar fascia and on the fascia itself, as well as the Achilles, he prescribed plantar fascia boots and discussed an ice cylinder massage with Ms. Hamblin. (*Id.*) Dr. Salter also noted Ms. Hamblin had difficulty affording her medication and had to stop taking Cymbalta and Provigil. (*Id.*) Dr. Salter observed that Ms. Hamblin had increasing depressive symptoms and stress-related problems; therefore he substituted a generic medication for Cymbalta. (*Id.*)

### B. Disability Evaluations

Tim Kockler, Ph.D., psychologically evaluated Ms. Hamblin on November 2, 2009, at the request of the state agency. (Tr. 805–09.) Ms. Hamblin reported she only received outpatient psychiatric treatment to obtain medical clearance for her spinal cord stimulator. (Tr. 806.) Dr. Kockler observed Ms. Hamblin's appearance and interaction seemed appropriate, and she had an average mental status. (Tr. 807.) However, Ms. Hamblin described her own mood as "'[k]inda sad and frustrated the past few days'" and her ability to function independently as limited in several areas. (*Id.*) Dr. Kockler noted she arrived thirty-five minutes late and drove ninety miles alone to the appointment. (*Id.*) Dr. Kockler diagnosed Ms. Hamblin with pain disorder associated with medical conditions and psychological factors but thought she could handle her own financial affairs. (Tr. 809.)

On November 4, 2009, Patricia Truhn, Ph.D., and Dennis Bouman, state agency consultants, found Ms. Hamblin had pain disorder, but they did not consider it a severe impairment. (Tr. 813–26.) The pain disorder mildly limited Ms. Hamblin's activities of daily living and her maintenance of concentration, persistence, or pace but did not limit her maintenance of social functioning or subject her to episodes of extended decompensation. (Tr. 823.) Mr. Bouman noted Ms. Hamblin's daily living activities included going out three to four times a week, driving, and shopping once or twice a month. (Tr. 825.) Ms. Hamblin also experienced problems sleeping and standing for too long due to the pain. (*Id.*) However, Ms. Hamblin could perform personal care and do a few light household chores. (*Id.*)

David O. Peterson, M.D., another state agency consultant, and Mr. Bouman, assessed Ms. Hamblin's physical RFC the same day. (Tr. 827–34.) Dr. Peterson found Ms. Hamblin could occasionally lift and/or carry ten pounds and frequently lift and/or carry less than ten pounds. (Tr. 828.) Dr. Peterson also found Ms. Hamblin could stand or walk for at least two hours in an eight-hour workday and sit for about six hours in an eight-hour workday. (*Id.*) Ms. Hamblin could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl but never climb ladders, ropes, or scaffolds, (tr. 829), and she needed to avoid concentrated exposure to extreme cold and vibration and avoid even moderate exposure to hazards, (tr. 831). Dr. Peterson found no manipulative, visual, or communicative limitations. (Tr. 830–31.) The assessment concluded Ms. Hamblin had a sedentary RFC. (Tr. 834.) On reconsideration in March 2010, other state agency consultants agreed with these physical and mental assessments. (Tr. 1009–10.)

On February 10, 2011, Ms. Hamblin saw Dr. Salter, and they completed a disability evaluation together. (Tr. 1061.) Dr. Salter opined Ms. Hamblin "would be essentially

unemployable" because she would need to rest frequently, she could not sit or stand for more than an hour or two, and she reacted to stress and pressure with mental confusion and fatigue. (*Id.*)  He noted she "[had] been doing better with her pain management" and "not been requesting early refills" of pain medication since she stopped working.  (*Id.*)

Dr. Salter and Ms. Hamblin discussed her social security disability claim again on November 11, 2011.  (Tr. 1036.)  On November 14, 2011, Dr. Salter completed a physical RFC statement for Ms. Hamblin.  (Tr. 1032–35.)  Dr. Salter opined Ms. Hamblin could not walk any distance without pain and had trouble balancing when ambulating due to her foot pain.  (Tr. 1033.)  She could sit for about one hour total and stand for less than an hour total in an eight-hour workday.  (Tr. 1033–34.)  Dr. Salter further stated Ms. Hamblin could sit for thirty minutes at one time, stand for twenty minutes at one time, and walk fifteen minutes at one time.  (Tr. 1033.)  Dr. Salter noted Ms. Hamblin would be "off task" more than thirty percent of an eight-hour workday, absent from work five or more days per month, and unable to complete an eight-hour workday five days or more per month.  (Tr. 1035.)  Dr. Salter expected Ms. Hamblin would have less-than-a-fifty-percent efficiency rate.  (*Id.*)  Ms. Hamblin could not obtain and retain regular work due to her chronic pain and fatigue according to Dr. Salter, but she could manage benefit payments.  (*Id.*)

On November 17, 2011, Dr. Salter wrote another letter to the state agency describing Ms. Hamblin's medical history and medication regime.  (Tr. 1030–31.)  In that letter, Dr. Salter stated Ms. Hamblin had chronic anxiety syndrome, fibromyalgia, chronic neck and low back pain that radiated into her arms and legs, shoulder pain, and plantar fasciitis "with such foot pain that she can hardly walk."  (*Id.*)  Dr. Salter also reported Ms. Hamblin had recurring headaches and petit mal seizures.  (Tr. 1030.)  Ms. Hamblin took various medications for her conditions,

including Oxycodone for pain and Buspirone for anxiety.  (*Id.*)  Dr. Salter concluded that Ms.

Hamblin's conditions limited her ability to maintain regular employment.  (Tr. 1031.)

### C.  Hearing Testimony

At the Hearing, Ms. Hamblin testified she has hard and deep pain in her neck, right upper

back, and right shoulder that radiates down her right arm to the ends of her fingers.  (Tr. 49–50.)

When doing repetitive actions with her hand, like writing or typing, Ms. Hamblin feels pain in

those areas, and her hand goes numb.  (Tr. 50.)  Ms. Hamblin also testified she has low back pain

that radiates to her right buttock, right thigh, and both legs and feet.  (Tr. 52.)  She stated that her

2007 spinal fusion helped for a while before it failed.  (Tr. 53.)  The injections also helped but

Ms. Hamblin reported having to stop them because she could not afford them.  (Tr. 54.)  Now,

her spinal stimulator makes the pain bearable, although the pain has not disappeared completely.

(*Id.*)  Ms. Hamblin also described having fibromyalgia pain in her arms, knees, elbows, legs, and

feet, stating it feels "like having bruised muscles," and the stronger points constantly ache while

the rest burn.  (Tr. 55–56.)  Ms. Hamblin testified she has migraines about once a month that felt

like "a bunch of knives . . . stuck in [her] head."  (Tr. 56.)  Injections help when her migraines

get really bad, but she normally takes her pain medications and goes to sleep.  (Tr. 57.)

Ms. Hamblin testified her medications make her feel extremely drowsy, lethargic,

forgetful, confused, and indecisive.  (Tr. 58–59.)  She also reported getting dizzy and having

blurred vision.  (Tr. 59.)  Ms. Hamblin reported lying down or resting nine hours a day before

going to sleep.  (Tr. 58–59.)  She estimated she could walk half a block without having to stop

and rest, lift about ten to fifteen pounds, and carry about five pounds.  (Tr. 61.)  She could sit and

stand for about ten to fifteen minutes each at one time and sit and stand for about two hours each

in an eight-hour period.  (Tr. 62–63.)  Ms. Hamblin testified she usually watches TV, reads, uses

the computer, and does very light household chores during the day.  (Tr. 63–64.)  She also reported she could cook pre-packaged meals, wash a few dishes at a time, and pick fruits and vegetables from her garden, (tr. 67–68), but could no longer scrapbook, craft, or make jewelry, (tr. 64–65).  Ms. Hamblin drives around town two or three times a week, goes to church every Sunday, and participates minimally in her husband's Cub Scout meetings.  (Tr. 63, 65–66.)

The vocational expert ("VE") testified Ms. Hamblin's past relevant work includes customer service representative, telephone solicitor, and retirement representative.[3]  (Tr. 69–71.) The VE opined Ms. Hamblin could still perform work as a customer service representative and a telephone solicitor, even with her various limitations.  (Tr. 73.)

### III.  STANDARD OF REVIEW

42 U.S.C. § 405(g) provides for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA").  This Court reviews the Commissioner's decision to determine whether substantial evidence in the record supports the Commissioner's factual findings and whether the Commissioner applied the correct legal standards.  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).[4]  The Commissioner's findings shall stand if supported by substantial evidence.  42 U.S.C. § 405(g).  Adequate, relevant evidence that a reasonable mind might accept to support a conclusion constitutes substantial evidence.  *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).  The standard "requires more than a scintilla, but less than a preponderance."  *Lax*, 489 F.3d at 1084 (citation omitted).  "Evidence is not substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by

---

[3] Whether the ALJ included auto salesperson and real estate salesperson in Ms. Hamblin's past relevant work remains unclear as she only performed each job for a month.  (Tr. 70–71.)
[4] Courts apply the same analysis in determining disability under Title II and Title XVI.  *House v. Astrue*, 500 F.3d 741, 742 n.2 (8th Cir. 2007).

treating physicians)—or if it really constitutes not evidence but mere conclusion." *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (internal quotation marks and citation omitted).

Although the reviewing court considers "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases," it "will not reweigh the evidence or substitute [its] judgment for the Commissioner's," *Lax*, 489 F.3d at 1084 (internal quotation marks and citation omitted), but "review only the *sufficiency* of the evidence," *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) (citation omitted).  The court does not have to accept the Commissioner's findings mechanically, but must "examine the record as a whole, including whatever in the record fairly detracts from the weight of the [Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test has been met." *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994) (internal quotation marks and citation omitted).  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence," and the court may not "displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Lax*, 489 F.3d at 1084 (alteration in original) (internal quotation marks and citations omitted).

In addition to a lack of substantial evidence, the reviewing court may reverse where the Commissioner uses the wrong legal standards or the Commissioner fails to demonstrate reliance on the correct legal standards.  *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993).

## IV.  ANALYSIS

The Social Security Act ("Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Moreover, an individual is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant qualifies as disabled within the meaning of the Act, the SSA employs a five-part sequential evaluation. 20 C.F.R. § 404.1520(a)(1).  The analysis evaluates whether:

(1) The claimant presently engages in substantial gainful activity;
(2) The claimant has a medically severe physical or mental impairment or combination of impairments;
(3) The impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation which precludes substantial gainful activity;
(4) The impairment prevents the claimant from performing his past work; and
(5) The claimant possesses a residual functional capacity to perform other work in the national economy considering his age, education, and work experience.

*See* 20 C.F.R. § 404.1520(a)(4) (outlining the five-step sequential evaluation); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (citations omitted) (same).  The claimant bears the initial burden of establishing his disability in the first four steps. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989).  At step five, the burden shifts to the Commissioner to show the claimant retains the ability to perform other work existing in the national economy. *Id.*

The ALJ evaluated Ms. Hamblin's claims through step four, making the following findings of fact and conclusions of law with respect to Ms. Hamblin:

1.  "[Ms. Hamblin] meets the insured status requirements of the Social Security Act through December 31, 2012." (Tr. 17.)
2.  "[Ms. Hamblin] has not engaged in substantial gainful activity after June 4, 2009, the amended alleged onset date." (*Id.*)
3.  "[Ms. Hamblin] has the following severe impairments: degenerative disc disease of the cervical and lumbar spine, right shoulder bursitis, fibromyalgia and planter [*sic*] fasciitis (20 CFR 404.1520(c))." (*Id.*)
4.  "[Ms. Hamblin] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." (Tr. 18.)
5.  "[Ms. Hamblin] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except:
    - She is limited to occasionally lift and/or carry (including upward pulling) a maximum of 10 pounds occasionally and less than 10 pounds frequently;
    - She is limited to standing or walking for a total of about two hours in an eight-hour workday;
    - She is limited to sitting for a total of about six hours in an eight-hour workday;
    - She must have the option to alternate positions from sitting to standing (the sit/stand option) about every 15 minutes;
    - She must never climb ladders, ropes and scaffolds;
    - She is limited to occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling;
    - She must avoid concentrated exposure to extreme cold and vibration." (Tr. 19–20.)
6.  "[Ms. Hamblin] is capable of performing past relevant work as a customer service representative and telephone solicitor. This work does not require the performance of work related activities precluded by [Ms. Hamblin's] residual functional capacity (20 CFR 404.1565)." (Tr. 25.)
7.  "[Ms. Hamblin] has not been under a disability, as defined in the Social Security Act, from April 16, 2005, through the date of this decision (20 CFR 404.1520(f))." (Tr. 26.)

In short, the ALJ concluded Ms. Hamblin did not possess an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, and she had the RFC to perform past relevant work as a customer service representative and a telephone solicitor supervisor from the original alleged onset date through the date of the Decision. (Tr. 18–26.)

In support of her claim that the Court should remand the Commissioner's decision, Ms. Hamblin argues the ALJ erred:  (1) by failing to evaluate properly the opinion of her treating physician, Dr. Salter; (2) by improperly evaluating her credibility; and (3) by failing to discuss all of her impairments in his RFC assessment analysis.  (Pl.'s Opening Br. 6–7, ECF No. 17.)

### A.  Evaluation of Dr. Salter's Opinion

Ms. Hamblin argues the ALJ erred by failing to provide substantial evidence for according little weight to Dr. Salter's, her treating physician's, opinion.  (Pl.'s Opening Br. 8–13, ECF No. 17.)  The undersigned agrees.

An ALJ must evaluate every medical opinion.  20 C.F.R. § 404.1527(c).  If the ALJ finds a treating physician's opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques [and] not inconsistent with the other substantial evidence in [the] case record," the ALJ must give the opinion controlling weight.  20 C.F.R. § 404.1527(c)(2).  When the ALJ does not give a treating physician's opinion controlling weight, the ALJ must consider certain factors in determining what weight to give the opinion.  *Id.*  20 C.F.R. § 404.1527(c)(2) provides these factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1300–01 (10th Cir. 2003) (citation omitted).  To reject a medical opinion, the ALJ must provide "'specific, legitimate reasons' for his decision."

*Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (citation omitted).

The ALJ's decision need not discuss explicitly all of the factors for each medical opinion.

*See Oldham*, 509 F.3d at 1258 (stating that a lack of discussion of each factor does not prevent

-17-

the court from according the decision meaningful review).  When considering medical opinion evidence, the ALJ must weigh and resolve evidentiary conflicts and inconsistencies.  *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) (noting that trier of fact resolves conflicts between medical evidence).

The ALJ implicitly rejected giving Dr. Salter's opinion controlling weight because he did not find Dr. Salter's opinion well supported by objective evidence.  (*See* tr. 24–25 (giving Dr. Salter's opinion little weight for several reasons, including being unsupported by medical evidence).)  The ALJ stated Dr. Salter's medical records lacked documentation of objective medical evidence to support his opinion that Ms. Hamblin had several impairments, including chronic anxiety syndrome, plantar fasciitis, chronic neck pain radiating into her shoulder/arm, migraines, and petit mal seizures.  (Tr. 24.)

Objective medical evidence includes "medical signs and laboratory findings."  20 C.F.R. § 404.1512(b)(1).  The regulations define medical signs as observable "anatomical, physiological, or psychological abnormalities . . . shown by medically acceptable clinical diagnostic techniques."  20 C.F.R. § 404.1528(b).  "[A]natomical, physiological, or psychological phenomena . . . shown by the use of medically acceptable laboratory diagnostic techniques," such as "chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests" constitute laboratory findings.  20 C.F.R. § 404.1528(c).

The ALJ accurately notes that no objective medical evidence in Dr. Salter's medical records supports Dr. Salter's opinion that Ms. Hamblin has petit mal seizures.  (*See* tr. 24.)  Dr. Salter's records only note reliance on an older EEG showing "some wave-form abnormalities" for finding a history of petit mal seizures.  (Tr. 302.)

-18-

However, contrary to the ALJ's assertion, (*see* tr. 24), objective medical evidence does exist in Dr. Salter's records that could support his other opinions.  Objective evidence confirms Ms. Hamblin's chronic neck pain with radiating shoulder and arm pain:  Dr. Salter ordered an MRI, (tr. 340–41), which showed mild degenerative disc disease and minor disc bulge at C5-C6, (tr. 284), supporting his opinion that Ms. Hamblin had chronic neck pain, (tr. 338–341).  Dr. Salter discussed the results of the MRI with Ms. Hamblin and noted that her fibromyalgia probably aggravated her neck problems.  (Tr. 1068.)  During several visits, Dr. Salter found Ms. Hamblin's shoulder and arm area tender or tight and often gave her injections to ease the pain. (Tr. 310, 314–15, 840, 1023, 1064.)  During these same visits, Dr. Salter often observed trigger points, reduced range of motion, and the success of injections, (*id.*), all objective medical evidence.

In *Glenn v. Apfel*, 102 F. Supp. 2d 1252, 1259–61 (D. Kan. 2000), the court reversed the ALJ's decision and directed the awarding of benefits under similar conditions.  Specifically the ALJ discredited two treating physicians' opinions by stating they lacked objective medical evidence and relied on the claimant's subjective complaints.  *Id.* at 1260.  The court in *Glenn* found these reasons illegitimate because both doctors found the claimant had trigger points, and the existence of trigger points constitutes objective medical evidence.  *Id.* at 1259–60; *see also Green v. Barnhart*, 262 F. Supp. 2d 1271, 1280 (N.D. Okla. 2003) (finding ALJ's discounting of treating physician's opinion for lack of objective medical evidence "an impermissible substitution of the ALJ's own 'medical expertise' for that of Plaintiff's treating physician" where treating physician documented "fatigue, muscle pain, and trigger points").  While the ALJ could have debated the weight of that evidence--i.e. only mild degenerative disc disease, therefore

unlikely to cause so much pain--he instead misstated the record by saying no objective medical evidence existed.  This misstatement undermines the ALJ's opinion.

Additionally, although Ms. Hamblin mostly self-reported her migraines and described them as minimal, (*e.g.*, tr. 1023), the ALJ noted Imitrex worked in one instance, (tr. 24; *see* tr. 57 (testimony stating injections help migraines)).  The ALJ questioned Dr. Salter's credibility because he had not prescribed Ms. Hamblin Imitrex, (tr. 24), but a physician's assistant observed that Ms. Hamblin's Cymbalta reacted poorly with the Imitrex, (tr. 309).  Thus, while a basis exists for the ALJ to consider the migraines of less consequence, the lack of prescription of Imitrex does not provide a basis to discredit Dr. Salter.  Rather, the statement suggests an unfamiliarity with portions of the record.

The ALJ also found the diagnosis of chronic anxiety syndrome unsupported by objective medical evidence and noted that mentions of Ms. Hamblin's anxiety in Dr. Salter's notes, (tr. 302, 1062), typically described her as doing fairly well.  (Tr. 24.)  The ALJ failed to note, however, that Dr. Salter also observed Ms. Hamblin having psychological issues, (*see*, *e.g.*, tr. 1041), and prescribed Buspirone to Ms. Hamblin for her anxiety, (tr. 1030).  Thus again, the ALJ's comments misstate the record.

Furthermore, Dr. Salter treated Ms. Hamblin's plantar fasciitis with more than just pain medications.  He gave her bilateral injections, (tr. 1042), prescribed plantar fascia boots, (tr. 1041), recommended an ice cylinder massage, (*id.*), and referred her to another doctor to discuss orthotics, (tr. 1062).  Thus, the ALJ's conclusion that Dr. Salter prescribed no treatment for Ms. Hamblin's plantar fasciitis, (tr. 24), misstates the record.  Because the ALJ misstates the record, the undersigned has difficulty concluding substantial evidence supports the ALJ's first reason to accord Dr. Salter's opinion little weight.

Secondly, the ALJ purports to give Dr. Salter's opinion little weight because the ALJ views Dr. Salter as lacking objectivity as evidenced by Dr. Salter's reliance on Ms. Hamblin's self-reports and Dr. Salter's willingness to provide additional pain medication. (Tr. 24–25.) Although Dr. Salter did alter Ms. Hamblin's treatment because she appeared distraught in the instance the ALJ mentioned, the ALJ neglected to mention that Dr. Salter sometimes refused to refill Ms. Hamblin's medications early or increase her doses. (*See, e.g.*, tr. 307.) Additionally, when Dr. Salter refilled Ms. Hamblin's medications early in the instance the ALJ mentioned, he warned her she would have to make the medication last another six weeks until her next scheduled refill. (Tr. 1021.) Dr. Salter continually spoke to Ms. Hamblin about the importance of keeping her medication levels consistent. (Tr. 310, 1046.) Given the ALJ's other misstatements of the record, the undersigned has concerns that the ALJ did not consider all of these instances in drawing his conclusion. At the end of the ALJ's exposition on this point, he noted that when the treating physician's opinion "departs substantially from the rest of the evidence in the record," the treating physician's motive may prove questionable. (Tr. 25.) The ALJ did not however provide a record-based discussion of how Dr. Salter's opinion departs substantially from the record evidence.

The ALJ also stated Dr. Salter seemed very sympathetic towards Ms. Hamblin because Dr. Salter recommended Ms. Hamblin apply for disability. (Tr. 24.) The record does not support this statement. Dr. Salter did not suggest Ms. Hamblin apply for disability; Ms. Hamblin stated her intent to apply, and Dr. Salter told her how to proceed. (Tr. 314.) Certainly, Dr. Salter assisted Ms. Hamblin in the process after she made her decision by giving her advice, filling out forms, and writing letters. (*See, e.g.*, tr. 314, 1030–36.) Nonetheless, the ALJ misstated the record by stating Dr. Salter recommended Ms. Hamblin apply for disability.

Finally, the ALJ gave Dr. Salter's opinion little weight because Dr. Salter reached a dispositive legal issue reserved for the Commissioner when he opined that Ms. Hamblin could not work.  (Tr. 25.)  Certainly, the ALJ should discount Dr. Salter's conclusion about Ms. Hamblin's employability, as Dr. Salter has no expertise in that field.  Indeed, the ALJ should not give that specific opinion any special significance.  *See* 20 C.F.R. § 404.1527(d)(3) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner . . . ."); SSR 96-5p, 1996 WL 374183 (July 2, 1996) ("In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 CFR § 404.1527[(c)] . . . [h]owever . . . the adjudicator is precluded from giving any special significance to the source . . . .").  Nonetheless, Dr. Salter's opinion on this point does not justify the ALJ discounting Dr. Salter's opinions in other areas, and the Decision does not specify how this point affected the ALJ's overall weighing of Dr. Salter's opinion.

Based on the discrepancies with the record, substantial evidence does not support the ALJ's reasons for giving Dr. Salter's opinion little weight.  Therefore, the undersigned RECOMMENDS remand for further analysis.

### B.  Evaluation of Ms. Hamblin's Credibility

Ms. Hamblin also argues that the ALJ improperly evaluated her credibility.  (Pl.'s Opening Br. 16–19, ECF No. 17.)  The undersigned agrees.

"Credibility determinations are peculiarly the province of the finder of fact, and [a court] will not upset such determinations when supported by substantial evidence." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (internal quotation marks and citation omitted).  "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" *Id.* (alteration in original) (citation omitted).  If

objective medical evidence shows a medical impairment that produces pain, the ALJ must consider the claimant's assertions of severe pain and decide the extent to which the ALJ believes the claimant's assertions.  *Id.*  But this analysis "does not require a formalistic factor-by-factor recitation of the evidence.  So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied."  *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

The ALJ gave two reasons for discrediting Ms. Hamblin's testimony.  First, the ALJ stated that Ms. Hamblin's daily living activities exceeded her purported disabilities.  (Tr. 23.) Ms. Hamblin could care for and groom herself.  *Id.*  Although she testified she could only drive short distances around town, she drove ninety miles alone to her psychological evaluation.  *Id.* Ms. Hamblin also traveled to various places, including California to care for her sick mother for several weeks.  *Id.*  The record establishes these facts.  (Tr. 807, 825, 1021, 1023.)  Therefore, substantial evidence supports the ALJ's first reason.

Second, the ALJ stated that Ms. Hamblin sometimes failed to comply with her treatment. (Tr. 23.)  Specifically, the ALJ found Ms. Hamblin overused or dropped medications on her own accord, including Provigil.  *Id.*  However, the record clearly shows Ms. Hamblin dropped some of her medications, including Provigil, because she could no longer afford them.  (Tr. 1023, 1041, 1065, 1068.)  If a claimant cannot afford medications, the ALJ should not use that as a reason to discount the claimant's testimony.  SSR 96-7p, 1996 WL 374186, at *7–8 (July 2, 1996) (stating inability to afford treatment may provide a credible reason to not follow treatment consistently).  Because the Decision does not specify how heavily the ALJ relied on this reason, the undersigned RECOMMENDS remand for further analysis.

### C.  RFC Consideration

The RFC reflects the ability to do physical, mental, and other work activities on a sustained basis despite limitations from the claimant's impairments.  20 C.F.R. § 404.1545(a)(1).  The step-four analysis involves three phases:

> In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC), and in the second phase, he must determine the physical and mental demands of the claimant's past relevant work.  In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one.  At each of these phases, the ALJ must make specific findings.

*Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (citation omitted).  In determining the claimant's RFC, the ALJ considers all of the claimant's medically determinable impairments, including those considered not "severe."  20 C.F.R. § 404.1545(a)(2).  Ms. Hamblin argues the ALJ did not consider any limitations stemming from her medications' side effects or her obesity in determining her RFC thus making the ALJ's assessment incorrect.  (Pl.'s Opening Br. 13–16, ECF No. 17.)

The ALJ explicitly mentioned and considered the side effects of Ms. Hamblin's medications in the Decision.  (Tr. 20–21, 24.)  However, the ALJ did not find the side effects significant because evidence of the side effects came from Dr. Salter's opinion and Ms. Hamblin's testimony, both of which the ALJ significantly discounted.  (Tr. 22–25.)  Because the undersigned finds the ALJ improperly evaluated Dr. Salter's opinion, (*see supra* Part IV.A.), and Ms. Hamblin's credibility, (*see supra* Part IV.B.), the Court finds it cannot assess whether the ALJ properly excluded the side effects from Ms. Hamblin's medications in his RFC assessment.

Additionally, the ALJ only mentions Ms. Hamblin's gastric bypass and subsequent weight loss when recounting her testimony in the Decision.  (Tr. 20.)  By contrast, the record notes, despite the gastric bypass, the need for further weight loss.  (Tr. 847, 1046, 1051.)  SSR

02-1p, 2002 WL 34686281, at *6 (Sept. 12, 2002), requires the ALJ consider the effects of obesity, which "may not be obvious," when assessing a claimant's RFC.  The ALJ failed to do so.

The government cites *Briggs v. Astrue*, 221 F. App'x 767 (10th Cir. 2007), to argue that the ALJ did not need to factor Ms. Hamblin's obesity into his RFC assessment because she did not allege it as an impairment, and her medical records did not demonstrate her obesity impaired her.  (Def.'s Answer Br. 19–20, ECF No. 18.)  In *Briggs*, the magistrate judge found the ALJ did not err in excluding the claimant's obesity at step two of the disability evaluation because "none of Plaintiff's physicians indicated that obesity was a factor in regard to exertional, postural and social functions," and the claimant did not "testify that his weight contributed to his inability to engage in activities in any way."  *Briggs*, 221 F. App'x at 770–71.

While, like the claimant in *Briggs*, Ms. Hamblin did not raise obesity in either her application or at the Hearing, the Court has already recommended reconsideration.  Given SSR 02-1p clearly mandates that the ALJ consider obesity at this step, and the record includes several instances where Dr. Salter recommended Ms. Hamblin lose weight or noted Ms. Hamblin's weight caused problems for her, (tr. 847, 1046, 1051), the ALJ should consider Ms. Hamblin's obesity in determining her RFC on remand.

For these reasons, the undersigned RECOMMENDS the District Court order the ALJ to consider the side effects of Ms. Hamblin's medications and her obesity explicitly in determining her RFC on remand.

## V.  RECOMMENDATION

For the reasons set forth above, the undersigned RECOMMENDS the Court remand the Commissioner's decision.

The Court will send copies of this Report and Recommendation to all parties, who are hereby notified of their right to object.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  The parties must file any objection to this Report and Recommendation within fourteen (14) days of service thereof.  *Id.*  Failure to object may constitute waiver of objections upon subsequent review.

DATED this 12th day of March, 2015.

BY THE COURT:

EVELYN J. FURSE
United States Magistrate Judge